Good morning, your honors. My name is Andrew Schwartz. I'm with Casper Meadows & Schwartz. Make sure your proponent is ready here. I'm sorry. Okay. Go right ahead. With Casper Meadows & Schwartz here on behalf of Rhonda Fernandez, I think where the court committed its most egregious error below is on pages 19 and 20 of its decision, where it found that the record simply does not support any wanton pain being afflicted upon Fernandez by wholesome. And it appears it was for that reason that the court found that there was no Eighth Amendment violation in this case. I would submit to the court that under these circumstances and because of all of the other laws and all of the other states and all of the treatises that have been written in this regard, that you don't have to inflict pain as a prisoner prison guard to extract sex from an inmate to commit an Eighth Amendment violation. The test is whether or not the evolving standards of society allow that type of conduct. And I think that we have established convincingly because 48 states, the federal courts, and particularly in California, it is a felony for Mr. Holson to do what he did. Because it is a felony for him to do what he did in this case, to act like a predator, to seek out the plaintiff, foist himself upon her, create this relationship that ultimately did lead to a consensual sexual relationship that doesn't absolve him of what I consider to be a violation of law and an Eighth Amendment liability. But I ask you, this is a highly disturbing case. Yes. And what happened here obviously is, if not negligence, which of course is the cause permitted to go forward, but is definitely outrageous. We, however, have to fit it into the Monell construct, and that's where I come up short. Even if it were an Eighth Amendment violation, how is there liability under Monell? There is liability under Nomell because he was not properly trained. We argued in our papers, and we've submitted records to the Court, that although it was illegal, Mr. Holson remembers not being trained whatsoever. The other deputy, whose name skips my mind, who testified on those issues, doesn't remember being trained. And there was not one written document in the thousands of pages that we were able to obtain and make part of this record that indicated that deputies were told ways to avoid having sex with the inmates. He knew it was against the rules. Yes. Yes, he, well. He did that from some place. Yes, he did. But the types of situations to avoid, the circumstances to look for it for other people, as I was thinking about what actually happened here, the whole notion that this was going on without any supervisor knowing about it, to me, doesn't make sense. This all happened out in the open. And for that reason, we would submit to you the evidence that at the time of his appointment and his resignation, Holson never worked by himself, always worked for others. For two months when most of the contact occurred between the two, he wasn't even assigned to the EPOD where the plaintiff was residing. He would have to leave his post and go somewhere else. I would submit to you that the evidence that we've established, and please remember that summary judgment was granted against us, not in favor of us, and at the very least we should be allowed to present facts to a trier of fact to indicate that this was a policy of the city and county of San Francisco and that they did know that this was going on. We submitted expert testimony at the trial court level indicating that the training was insufficient. The court rejected that out of hand and said what the court told me. He knew there was a rule against it, therefore there couldn't be a Monell claim. The court assumed that he was properly trained, but when you look at all the material that supports whether or not he was properly trained, there is not one written document that would support the fact that these people were given any time during the hundreds of hours of training that they go through. At the very least, a jury should be able to decide or allowed to decide as to whether or not the training, if there was any, that was given was enough and sufficient. Experts should be allowed to testify. They should be allowed to refer to articles that have been written about this very significant problem in jails. But the court in this case said as a matter of law, you're out. And you shouldn't be allowed to proceed. I think that at the very least, we should be able to submit to a jury that the training that this department provides to its staff is insufficient and let them decide that as part of the facts of this case. Is a failure to train proof of that ipso facto equal a Monell or city of Canton violation? Yes, it is, if there is an underlying Eighth Amendment violation, which I submit that there is as a matter of law. The court made reference in the first case this morning that parties can – a party can ask for summary judgment and they can find that summary judgment should be granted against them. I would ask this court to make a finding that as a matter of law in this case, you cannot have sex with an inmate if you are a prison guard and not commit an Eighth Amendment violation. It violated the California Penal Code. It violates all common forms of decency, and there's no defense to it. The question we have is whether the situation the county was in rises to the level of deliberate indifference. I mean, some things, it's illegal, you're not supposed to do it. He's clueless. There's no doubt about that from reading the transcript. He still doesn't get it, I guess. Yes. But the question is, was the county deliberately indifferent? And I would submit to you that is not necessarily a question of law. It is perhaps a question of fact. The jury can be instructed that that is my burden. I will present my evidence to the court that they were given 800 hours of training. No document exists where they were trained that there was a regulation which said that it was prohibited, yet Holson was allowed to act over a 90-day period to go in and out of this module, bringing her lotion, bringing her presents, bringing her cars, and seducing this 19-year-old girl who was in jail for the first time for drunk driving. I mean, it was a horrible, horrible thing. And the court found against us. So it certainly violates, would violate any standard anywhere at any time for a prison guard to murder an inmate. Yes. Would you suggest that because in a hypothetical case, if the county government running a jail didn't instruct its corrections officers that they shouldn't murder or torture inmates, that that lack of training automatically equals a Monell violation? I think that this is a little more nuanced than that and a little more subtle than that. And people who generally apply to be prison guards might very well know that it's not okay to kill somebody. Torturing, you might be going some other place. But on the other hand, this is a little bit more nuanced. We're not talking about military. I understand. But the answer to your question is not necessarily. This is a little bit more nuanced, and the prisoners aren't there for the taking. And they have to be told that, and they have to be instructed that. And in any penological setting, this is the kind of thing that tempts the prison guards. And it's not me making this up. It's the reason why 48 state legislatures have made it a crime where consent is not a defense, which is why the federal law says it is illegal. Do you think this is the 1983 equivalent of statutory rape? Yes, I do. Or of child molestation or a rape of an insane person or of an intoxicated person. You simply cannot consent. I don't want to talk about my facts because once you start talking about facts, then you're talking about what the damages are going to be in this case. But a prisoner cannot consent to sexual relations with a guard. Yes, Your Honor. We have the issue teed up. You've got about five and a half minutes. Why don't you save that for a follow-up from the city and county at this time. Thank you for your argument. It may not be quite tall enough for you, Counsel. The world is not designed for people like me. If you could let me know if you're not hearing me. Just speak up. Okay. Good morning, Your Honor. I'm Scott Wiener from the Office of the San Francisco City Attorney, appearing for the city and also for Sheriff Michael Hennessy. Your Honor, I thought it was interesting that opposing counsel indicated he didn't want to talk about the facts. And that's because the facts here are so extreme. And I do also want to – I agree that it's appropriate to start with Monell because I understand that the Eighth Amendment issue is a thorny one. There's a lot going on there. I think we went on it. But I think that the Monell issue is not even close to being a close question. And I think we have to look at what the key facts are here. We know that the Department categorically prohibits this conduct. We know that Deputy Holsom not only was aware that he could be fired for it, but he testified that he received that policy manual as part of his training. Deputy Holsom, we know, went out of his way to hide this affair because he knew he could get fired. We also know that the Department does train its deputies. We know from Sergeant Miyamoto that that happens. We know that Lieutenant Kennedy teaches a class where he talks about it. We know that Senior Deputy Robinson teaches a class where he talks about it. So we know that there is a system-wide program, and that is the standard under Monell, whether there's a system-wide program, even if some people happen to fall through the cracks or happen to forget their training. Some of his fellow corrections officers knew about this, didn't they? Yes, Your Honor. Or suspected it. Knew about. Suspected the relationship. Apparently there was Deputy Holsom testified that another deputy, Deputy Reed, who her deposition was not taken to my knowledge, so it's hearsay that she knew about it. But according to Deputy Holsom, she approached him and asked him what was happening, and he told her that nothing was happening. So her training was obviously good enough that she knew that this was wrong if it was true, and she immediately confronted him about it and asked him if it was happening. He denied it and lied about it. Can you report that up the line? There's no evidence, Your Honor, that she reported it. In addition, Your Honor, there's no evidence about when she confronted him about that. She may have learned about it and confronted him about it five minutes before this was reported to the Department and five minutes before they took action to figure out what was going on, in which case it would have no relevance whatsoever if she found out about it at the same time that the Department higher-ups found out about it. She could have approached him after the Department found out about it, meaning that she heard about it through the grapevine and went up and asked him. We don't know. Deputy Holsom never said, and there's no evidence in the record about when that happened. Were there supervisors in the pod where Ms. Fernandez was housed on duty when this officer would visit her? Your Honor, the only evidence in the case about who else was present was Deputy Bruneman, because there always has to be at least one female deputy. And Deputy Bruneman was in January of 2001. She was on duty with Deputy Holsom in EPOD, and she said that she had absolutely no indication whatsoever that there was anything going on, and she was shocked to find out about it. Your opposing counsel, if I heard him correctly, argued that the facts of the record suggest that Fernandez was housed in a unit where he didn't work. Is that right? For part of the time that this was going on, he did work there and was assigned there. The question, factual question, is addressed to that period of time, during the period of time when, is it Holcomb? Holsom. Holsom. Interesting name. When Holsom was visiting Fernandez in pod E, that's where she was? Yes. During the period of time when Holsom was not working there but visiting her there, were there supervisors present when he would visit? There's no evidence in the record that there were any supervisors who were present, and I don't believe that there were any who were necessarily physically with him on the pod. Of course, there are supervisors who are in the jail, but they're the actual line deputies who, for the most part, are the ones who are in the pods. Are the cells visible to the people in the control room? Are the cells, you mean by video? Yes. There is no evidence in the record about that, Your Honor. And I think that the video, I would imagine, would be quite extensive, but there's been no testimony.  And I will just note that the system that the two had in place didn't necessarily entail him going into her cell. They would have signals that they used, a flashlight flashing, where she would then go into the phone room to make a phone call to him. There were also a few times where, because she was a trustee, so-called, and was able to do certain tasks in the jail, that he would escort her. And the sex itself actually took place on those two brief occasions in the supply room. So even if they didn't know everything that was going on inside of her cell, there wasn't anything happening in there because it happened outside of the cell through the use of these signals. Your Honor, I think Mr. Schwartz's argument, I think it boils down to this, that at a minimum, there should be a trial because there's factual issues about this policy. And it's not enough to just have a policy that says you shouldn't have sex, which is written in the manual. You can't just leave it at that. And so there's at least factual issues as to whether this was sufficient to overcome the male liability. Okay. And I'll address that exactly, Your Honor. And there are two responses I have. The first is that there wasn't just a policy. There was training. And I've already mentioned the supervisors who talked about the training that they did, and Holstom's records show that he was in those classes. We also know that Sergeant Miyamoto testified that he had received training when he began at the department on this precise issue. Deputy Lavin, whose deposition was taken, testified that she was trained on this precise issue. Deputy Bruneman testified that she was trained on this issue. And there's an exhibit attached to her deposition in the record that talks about how to avoid inappropriate dealings with prisoners. Sergeant Cunningham testified that he received training when he came to the department. And with respect to Ballesteri, who was the gentleman that Mr. Schwartz couldn't remember, and Holstom, this is very important, they didn't testify, oh, no, I never received that training. They testified, I don't remember. I don't remember. You go through hundreds and hundreds and hundreds of hours of training for six months in the police academy and from the department, and they didn't remember. Ballesteri did testify that he did vaguely recall training, that you're supposed to go and talk to a supervisor if someone's doing something wrong, which is another aspect of the training claim. But they did not at any point say, oh, I'm categorically denying that I did that. It was just a lack of memory. So we have two deputies who said, I just don't remember, even though I knew it was wrong. And we have half a dozen other people who said, yes, I was. Let me shift gears on you a little. In most of the civil rights cases we see, we now have to abide by saut�e de cas, which says we have to decide whether there's a constitutional violation as part of our qualified immunity analysis. My knowledge, I don't know if that's been applied in the Monell context. In your view, can we – were we to go to the second point, and that is the adequacy of the policy and training, in your view, can we sort of sidestep the constitutional issue, or do we have to decide it? Your Honor, I'm unaware of a case similar or analogous to Saussure that says you have to decide the constitutional violation first. I do recall, I think in another case, seeing cases that assume a constitutional violation but say no Monell. But I can't categorically tell you that. I'm unaware of any rule that would prohibit this Court from doing that. Well, I mean, I don't think there's some surface appeal in the sense that Monell is a form of immunity. Actually, it's not a form of immunity. The other side can't make Monell. They can't make the substance of their claim. Right, Your Honor. And the idea underlying saut�e de cas in cases like it is that you tell the world the parameters of the constitutional violation. In this case, if we were simply to rule based on Monell, would there be cases in this circuit that say, that address the issue of whether there can be consent in a situation like this? I'm not sure I'm understanding the Court's question. If the Court were to address Monell, assuming a constitutional violation. If we wrote an opinion that simply said, plaintiff can't, the district court was correct. You can't make Monell or City of Canton no policy, no willful, deliberate disinterest, et cetera, and not write further. Don't we leave the question open in this and perhaps other circuits as to whether, A, there can be consent in a situation like this, and if there can't be, whether it's an Eighth Amendment violation? I think the Court could write that opinion, because unlike qualified immunity, qualified immunity requires you to define the precise scope of the constitutional right at issue. You can't even reach the clearly established component without doing that first. For Monell, Monell isn't, is not a form of immunity. Actually, I think you've got it backwards. I think Saussure tells us we're supposed to hit the first and then the second. Right, exactly, Your Honor. And the purpose is to tell the people who operate in this world what the rules are in terms of what's clearly defined as proper and not proper. Exactly. And here I think you can. I think if the Court wants the rule on the Eighth Amendment issue, it's fine. But I think that you could analytically say, we're going to assume that regardless of consent, we're going to assume exactly what the plaintiff wants us to assume, even so there was adequate training here and there was no causation. Now, if I could just address a couple of other Monell issues. First of all, there was training. There were various people testified. Supervisors get trained about how to spot these issues, and deputies are trained how to spot others' misconduct. In addition, the Department had a very prompt and powerful and strong reaction to this once this inmate came forward and reported this, which I think undermines the argument that someone had to know about it and the Department just turned a blind eye. The Department was on this quickly and was very aggressive with Ms. Fernandez when she repeatedly lied at the beginning and said it didn't happen and brought her in over and over again until she confirmed what Holson had already told them, that it did happen, and they fired him immediately. What is the relevance of the after-the-fact response? Your Honor, I think because it goes to the argument that someone had to have known about this and the Department was turning a blind eye, I think it really undermines that argument. And I also just want to emphasize that this happened. It was two very fast sexual encounters. It happened over a period of six to eight weeks. One happened in the middle of December, the other one six to eight weeks later, according to Ms. Fernandez. This wasn't something that was going on for a year or four years. It happened six to eight weeks, and then the Department found out about it and jumped on it and put an end to it and fired Deputy Holson. So I just want to really emphasize the Matejko case and the Lewis case, and this goes to whether there's a question of fact here. There is no question of fact. In the Matejko case, that's the taser case, where there was three to four hours of total training on how to use a taser and no training whatsoever on the effects of voltage of particular levels on the human body. And the Ninth Circuit held, this Court held, that there was no Monell claim there, none. The Lewis case, similar with high-speed chases, those cases are much more extreme here, and I think, as the Court has already indicated, it's not that difficult a concept. It's not rocket science to say you can't have sex with inmates. It's a lot more complicated to tell people how to use tasers than how to do high-speed chases. If those weren't viable Monell claims, this is not a viable Monell claim. What they're doing is asking this Court to nitpick at the Sheriff's Department's policies and procedures and training to say you should have had a couple extra hours here, you should have had a couple extra documents in writing here, you should have done this little thing, extra that. But the whole point of the City of Canton, as applied by this Circuit, is that it's not for this Court or for an attorney to be nitpicking the training. There was training here. Deputy Holson knew about it. He was trained. There's no Monell liability here. And I think that's about my time. Roberts. Thank you for your argument, Counsel Rebuttal. Briefly, we cited a case in our brief, Munger v. City of Glasgow Police Department, a Ninth Circuit case in 2000, where they found that just because it's prohibited doesn't mean you necessarily properly train the employees. In that case, it involved allowing a drunk to drive home, I think. And there was a policy against it. They violated their own policy. A member of the department violated their own policy. And the Ninth Circuit found that just because it was illegal doesn't mean they were necessarily properly trained. Just because there was a rule and regulation in the Sheriff's Department prohibiting this type of conduct doesn't necessarily mean that they were properly trained. I'm not asking this Court to find anything except that we are entitled to a trial on the merits of whether or not this regulation in and of itself is adequate training under Monell. I think that we should be permitted to bring these facts out to the jury. I think that Counsel made the mention of the fact that there was a deputy on duty when Holson was seducing the plaintiff in this case. Perhaps, arguably, had she been properly trained, she would have recognized his behavior as inappropriate and wrong and could potentially lead to something and would have put an end to it. I mean, these are all questions that juries need to decide, not this Court. It is quite clear that there was a regulation against it, that Holson remembered no training, other deputies remembered no training, and there was not one written document in the hundreds and perhaps even thousands of training documents that were produced as part of the record in this case. Is there any evidence that a deputy didn't know that it was wrong? Not that I could think of. I would think that every deputy would know that it was wrong, but whether it was. Holson. I'm sorry. Including Holson. He knew that it was wrong and he felt that he could get away with it. Took affirmative steps to hide it. Yes. As did Ms. Fernandez. Both of them did. But on the other hand, the record still doesn't show ever where these folks were ever giving any formal instruction. They were all told that it was wrong. I don't think that the Court can say as a matter of law that's necessarily  I disagree completely with the notion that we're just trying to nitpick. I mean, if there was some document there, that would be one thing. There was a regulation against it. I don't think this is any different than the city of Glasgow case. What has happened if it's on the record to the summary judgment on the negligence per se claim against Holson? That was not appealed? It was granted and it wasn't appealed. Not appealed. Thank you. Okay. Thank you, counsel. I thank both counsel for their arguments. It's a very interesting case which will be submitted for decision. And we'll proceed to the last case on the calendar for this morning, which is Gurry v. McDaniel. Counsel are present if they'd come forward.
judges: Hawkins, McKeown, Clifton